1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15

| | |
|---|---|
| **CARL RAY JACKSON,** | Civil No.      12-cv-01701-DMS(NLS) |
| **Petitioner,** | |
| | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |
| **vs.** | |
| **KATHLEEN ALLISON,  Warden,** | |
| **Respondent.** | |

16
17
18
19
20
21
22
23
24
25
26

Carl Ray Jackson ("Jackson"), a state prisoner proceeding pro se and in forma pauperis with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition"), seeks relief from his August 27, 2007 convictions of the premeditated attempted murder of his girlfriend and assault with a semi-automatic firearm.  The trial court added enhancements for  prison, felony, and strike priors. He was sentenced to a prison term of sixty-seven years to life, plus a determinate term of ten years. The California Court of Appeal affirmed the judgment.  His petition for review was summarily denied by the California Supreme Court.  The San Diego County Superior Court subsequently denied him habeas relief, as did the state court of appeal. The California Supreme Court summarily denied the ineffective assistance of counsel claims he presented as his sole ground for habeas relief in that court. Respondent concedes that Jackson's Petition is timely, but contends that one of his claims is not exhausted and opposes any federal habeas relief.  (Ans. 2-3, ECF No. 12.)[1] Jackson filed a Traverse.

27
28

---

[1]   Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

(ECF No. 19.)  In consideration of the pertinent portions of the record and controlling legal authority,

it is recommended that the Petition be **DENIED**.

## I.      BACKGROUND

### A.      Factual Background

In its reasoned decision affirming the judgment, the California Court of Appeal summarized

the evidence presented at Jackson's trial.  Jackson does not dispute the accuracy of the summary.  A

presumption of correctness attaches to state court determinations of factual issues on federal habeas

review.  28 U.S.C. §2254(e)(1) (West 2006); Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009).

Jackson and Karen Vidrio began dating in 2000 and were in a relationship for about 18 months.  Both during and after their relationship there were several incidents of domestic violence.  In November 2001, Jackson chased Vidrio and smashed her head into a brick wall after a disagreement at a restaurant where they had been drinking.  Their relationship ended in April 2002, and Vidrio thereafter refused Jackson's repeated efforts to have contact with her.  On the evening of May 4, 2002, Jackson left Vidrio a phone message, and based on this message Vidrio reported to the police that he was going to kill her.  At about 11:15 p.m. that same night he jumped over her fence, pounded on her patio door, and broke through her front window.  While he was doing this, Vidrio was on the phone with the police.  When he entered her residence, he held a knife to her throat and said, " 'It's over.  I'm going to kill you.  I told you we were going to be together forever.' "  The police arrived and arrested him.  On May 30, 2002, after Jackson was released on bail, he entered Vidrio's home at night when she was not there and "destroyed [her] home" while he was waiting for her.  While at her home he stabbed himself about 31 times, and he was taken away by ambulance.  He was arrested, pleaded guilty to the offenses charged for the May incidents, and served about four years in prison.  He was released in April 2006.

The shooting involved in the case before us occurred at about 7:00 p.m. on October 29, 2006, at a bar (Shooters) frequented by Vidrio.  Vidrio testified that when she arrived at the bar that evening, she asked bartender Susan Kaelin if she could use the phone.  When Kaelin handed her the phone, Vidrio looked across the bar and saw Jackson talking to his friend, Nels Torguson, who also worked as a bartender at Shooters.  Vidrio went into the nearest bathroom because she knew Jackson "was there for [her]."  She stayed in the bathroom for a minute or two, but then decided to leave because she did not want to "be caught" in there.  Vidrio had a knife with her.  Before leaving the bathroom, she opened the knife, put it back in its sheath with the blade pointing down, and put it in the front of her pants.  When she walked out of the bathroom, she had her hand on the knife under her sweatshirt.  She had decided not to try to run away from Jackson since she had done that before and had been caught by Jackson.  She knew she was "going to have to fight for [her] life, because [she] knew the day was coming . . . . "

As Vidrio left the bathroom, she saw Jackson walking towards her.  She continued walking towards him.  She threw her purse down, intending to "try to survive."  However, within seconds, she saw him pull a gun out of his pocket, and she turned to "get out of there."  She never took the knife out of the sheath.  Jackson grabbed her, put the gun in her back, called her a bitch, and shot her in her back.  She fell against a pool table, and then was able to run out the back door of the bar.

Several eyewitnesses described their observations of the shooting. Torguson saw Vidrio get a phone from a bartender and go into the bathroom. About two minutes later, he saw Jackson arrive at the bar. Torguson asked Jackson if he and Vidrio were "okay together." Jackson stated that he and Vidrio were "fine." Torguson stated that was good because she was in the restroom. Jackson responded, "Then I guess I better leave." Jackson started walking in the same direction he had entered, which was towards the rear entrance and the restroom. The next thing Torguson knew, Jackson raised his arm and fired his gun. Vidrio was standing with her back towards Jackson when she was shot.

Kaelin testified that Vidrio asked her if she could use the phone at the bar "because her ex-boyfriend was going to kill her." After Kaelin handed Vidrio the phone, Vidrio went into the bathroom. About 30 seconds later, Kaelin saw Jackson. Jackson talked to Torguson, and then walked around by a pool table near the bathroom and looked around the bar. When Vidrio exited the bathroom, she put the phone down on the bar counter. Kaelin told her, " 'He's right behind me.' " Vidrio continued walking past Kaelin, and Jackson walked up to Vidrio. When they were about three feet apart, Vidrio turned around. Kaelin saw Vidrio's head go back "like he had pulled her hair." Kaelin then heard a shot and saw Vidrio's shoulders go back. At this time Vidrio's back was towards Jackson.

Bar patron Michael Grimaldi testified that he saw Vidrio enter the bar from the rear entrance, walk straight to the bar counter, and talk to Kaelin. Vidrio then entered the restroom with a telephone. Several minutes later, Grimaldi saw Jackson enter the bar and scan the room. Jackson then exited the bar by the rear entrance and paced by the back door as if waiting for someone. Vidrio exited the bathroom, gave the phone to Kaelin, and walked towards the area of the bar counter where she had left her things. Jackson re-entered the bar and walked towards Vidrio. Grimaldi saw Jackson walk up to Vidrio, and then saw that Jackson had a gun in his hand. Grimaldi stated "there's a gun," and started going towards Jackson. Jackson and Vidrio were about one foot apart, and Vidrio's back was towards Jackson when he had the gun up. By the time Grimaldi reached Jackson the shot had already been fired. Grimaldi and another man grabbed Jackson and the gun and wrestled him to the floor. Jackson was restrained by people at the bar and held until the police arrived.

Torguson, Kaelin, and Grimaldi never saw Vidrio holding a knife.

The emergency room surgeon (Dr. Jack Yang) who treated Vidrio testified that Vidrio suffered a gunshot wound to the back. The bullet tore through her lung, broke through a rib, and ended up in her chest. She was having difficulty breathing and was bleeding internally. Her injuries were life-threatening because without medical attention she could easily have bled to death and stopped breathing. She was treated surgically and remained in the hospital for about two weeks. The bullet was not removed because removal could have caused more damage.

*Defense*

Jackson, testifying on his own behalf, stated that after he was released from prison in April 2006, he was rebuilding his life and had a new girlfriend. Vidrio was spreading negative rumors about him which were causing problems with his new girlfriend and upsetting him. Jackson decided to contact Vidrio at Shooters and tell her to leave him alone.

Before going to Shooters, Jackson went to his mother's home to get a gun that he had stored there. He put the gun in his pants pocket and brought it with him

3

because he knew Shooters was "[Vidrio's] bar," and the people there were her friends. Also, the bar was a "tweaker bar" frequented by methamphetamine users, and methamphetamine users have a tendency to be "very unpredictable, aggressive, [and] paranoid."  He was concerned that people at the bar "would jump [him]," and he thought he might need to pull out the gun so he could "get out of there."  He did not go to the bar with the intention of killing Vidrio or of assaulting her with the gun.

Jackson testified that when he arrived at the bar, he was relieved he did not see Vidrio there because being at the bar reminded him how unstable and unpredictable she was. He then left the bar. However, when he noticed Torguson's car in the parking lot, he decided to drive his car around to the rear of the bar to see if Torguson was there.  After parking and getting out of his car, he saw a woman that might have been Vidrio (although he was not sure) sitting on the steps.  When the woman saw him, she stood up and went into the bar.  Jackson went and looked inside through the back door of the bar, and entered the bar when he heard Torguson call his name.  Torguson asked if he and Vidrio were "all right" and Jackson responded that they were.  Torguson told him Vidrio was in the bathroom, and Jackson responded that he had better leave. Because Jackson was now remembering how unpredictable Vidrio could be, alternating between being happy, paranoid, and angry, he decided he did not want a confrontation.

Jackson testified that as he was walking towards the back door to leave the bar, he saw Vidrio exit the bathroom.  Vidrio was looking at him and walking quickly towards him.  When she was about three or four feet from him, he saw that she was holding a knife in her right hand.  She was not pointing the knife at him, but was holding it in front of her with the blade open. Feeling threatened, Jackson grabbed her right arm and pushed her about five or six feet.  As he was doing this, he was also pulling out his gun for self-defense.  Vidrio now had her side towards him and she was still holding the knife in her hand.  As soon as he pulled out the gun, Vidrio stated, "He's got a gun."

According to Jackson, Grimaldi grabbed the gun but Jackson quickly pulled the gun away and regained control of it.  Because Grimaldi had grabbed the gun, Jackson now felt threatened by both Vidrio and others in the bar.  Jackson aimed the gun towards Vidrio and pulled the trigger.  In the instant when he pulled the trigger, Vidrio turned so her back was now facing him.[2]

Psychiatrist Richard Rappaport called by the defense explained the "flight or fight" response that arises when people perceive something threatening to them.  When this response is triggered, the brain reacts spontaneously without judgment or decision and critical thinking is eliminated.  Dr. Rappaport opined that the flight or fight response would be triggered when a person perceives a threat from another person approaching with a knife in his or her hand.

. . .

In closing arguments to the jury, defense counsel argued that Jackson should be acquitted of premeditated attempted murder and assault with a firearm based on reasonable self-defense in response to Vidrio's display of the knife.  Alternatively, defense counsel argued against the premeditated attempted murder charge, citing the expert testimony concerning the flight or fight response and urging the jury to find Jackson was acting out of irrational fear when he shot Vidrio even though her back was then turned to him.

---

2   *See* Lodgment No. 16, RT vol. 3, pp. 236-284.

1   (Lodgment No. 5, <u>People v. Jackson</u>, No. D053799 (Cal. Ct. App. Jan. 26, 2010), slip op. at 2-8.)

2        **B.**    **Procedural Background**

3        Jackson testified in support of his contention that he shot Vidrio in self-defense.  (Lodgment

4   No. 16, RT vol. 3, pp. 227-318.)  Rejecting his self-defense theories, the jury convicted him on

5   August 27, 2007 in San Diego County Superior Court Case No. SCE265902 of attempted murder (Cal.

6   Penal Code §§ 187, 664) and assault with a semi-automatic firearm (Cal. Penal Code § 245(b)).

7   (Lodgment No. 1,  Clerk's Transcript ("CT") vol. 1, pp. 0089-0091, CT vol. 2, pp. 301-304.)  The jury

8   also made true findings that he intentionally and personally discharged a firearm and proximately

9   caused great bodily injury (Cal. Penal Code § 12022.53(d)), that he personally used a firearm (Cal

10  Penal Code § 12022.5(a)), and that he personally inflicted great bodily injury involving domestic

11  violence (Cal. Penal Code § 12022.7(e)).  (<u>Id.</u>; *see also* Lodgment No. 16, RT vol. 5.)  On

12  November 26, 2007, after a bench trial, the court found that Jackson had one prior prison conviction

13  (Cal. Penal Code § 667.5(b)), two prior serious felony convictions (Cal. Penal Code §§ 667.5(a)(1),

14  668, 1192.7(c)), and two prior strike convictions (Cal. Penal Code §§ 667(b)-(i) and 1170.12).

15  (Lodgment No. 1, CT vol. 2, pp. 308-309; *see* Lodgment No. 16, RT vol. 6, pp. 431-441.)

16       Jackson obtained a substitution of appointed counsel in June 2007, before trial.  (Lodgment

17  No. 1, CT vol. 2, p. 0282.)  His second attorney represented him through trial and the preparation of

18  a new trial motion.  Before that motion was heard, Jackson requested and received new appointed

19  counsel from the Alternate Public Defender's Office. (<u>Id.</u>, p. 0311.) He later expressed dissatisfaction

20  with that attorney as well, and the trial court granted his request to represent himself.  (<u>Id.</u>, p. 0313.)

21  He was granted additional time to  prepare his own new trial motion as well as a motion to compel

22  disclosure of juror information.  (<u>Id.</u> p. 0317; Lodgment No. 16, RT vol. 7, pp. 445-454, RT vol. 8,

23  pp. 456-462.)  On August 8, 2008, the court granted Jackson's request for yet another appointed

24  attorney from the Alternate Public Defenders' Office.  (Lodgment No. 1, CT vol. 2, p. 0318.)  At a

25  hearing on September 12, 2008, the court denied both Jackson's motion for new trial and his motion

26  to compel disclosure of jury information, then sentenced him to an indeterminate prison term of sixty-

27  seven years to life, plus a determinate term of ten years.  (<u>Id.</u> pp. 0320-0321; Lodgment No. 16, RT

28  vol. 10.)

12cv1701-DMS(NLS)

Jackson raised two grounds for relief on direct appeal, both alleging error in the exclusion of evidence. (Lodgment No. 2, Appellant's Opening Brief, <u>People v. Jackson</u>, No. D053799 (Cal. Ct. App. Jun. 10, 2009.) The court of appeal affirmed the judgment in a reasoned decision. (Lodgment No. 5.) His Petition For Review raising the same two evidentiary claims (Lodgment No. 6) was summarily denied by the California Supreme Court. (Lodgment No. 7, <u>People v. Jackson</u>, No. S180698 (Cal. Apr. 14, 2010)). He sought habeas corpus relief in the state courts, proceeding pro se.

In his April 2010 habeas petition to the superior court, he claimed ineffective assistance of counsel ("IAC"), itemizing several alleged deficiencies. He also alleged in narrative fashion, among other things, that his "Sixth and Fourteenth Amendment rights to due process" and a fair trial were denied by: "failure to require the prosecution to prove beyond a reasonable doubt of [sic] every element of the offense charged"; "the prosecution had criminal charges of moral turpitude of the victim dismissed"; the "prosecution was not required to defend the fact that the victim was under the influence of methamphetamine at the time of the incident, of a self-defense case"; and "the defense was not allowed to use the victim's impeachment evidence". (Lodgment No. 8, pp. 3-4.) In a supplement to that petition (Lodgement No. 9), he "again contend[ed] there was ineffective assistance of counsel for failing to investigate a mental defense, the prosecution committed misconduct during closing argument and by suppressing evidence, and Petitioner is being subjected to cruel and unusual punishment." (Lodgment No. 10, <u>In re Jackson</u>, No. EHC753 (Cal. Sup. Ct. Jul. 12, 2010), slip op. at 2.) In a reasoned decision denying the petition in its entirety, the superior court rejected his evidentiary challenges based on state procedural rules governing direct and collateral relief from criminal convictions as well as his prosecutorial misconduct and cruel and unusual punishment claims on similar grounds. The court also rejected the several IAC claims Jackson asserted, applying inter alia <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). (<u>Id</u>. pp. 3-6.)

In a habeas petition to the California Court of Appeal, supplemented in a second filing, Jackson raised the several IAC claims the superior court had considered and rejected. (Lodgment Nos. 11, 12, <u>In re Jackson</u>, No. D058152.) In a reasoned decision, the court of appeal summarized those claims: "Petitioner contends that counsel was ineffective by failing to investigate and present a mental health defense, by failing to introduce evidence of the victim's methamphetamine use and prior criminal

conduct and by failing to object to the prosecutor's attack and barrage on petitioner's credibility during closing." (Lodgment No. 13, In re Jackson, No. D058152 (Cal. Ct. App. Oct. 29, 2010), slip op. at 1.) Applying the Strickland standards, the court addressed each claim in turn before denying the petition in its entirety. (Id. at 1-2.) In his habeas petition to the California Supreme Court, Jackson again raised only his IAC claims as his grounds for relief. (Lodgment No. 14, In re Jackson, No. S189491 (Cal. Dec. 30, 2010.) That court summarily denied the petition. (Lodgment No. 15, In re Jackson, No. S189491 (Cal. July 13, 2011 docket entry.)

Ground One in Jackson's federal Petition alleges that he was denied due process through exclusion of evidence that Vidrio was under the influence of methamphetamine at the time of the shooting. (Pet. 24, ECF No. 1.) As Ground Two, he alleges denial of due process and a fair trial through exclusion of certain impeachment evidence. (Id. p. 27.) As Ground Three, he alleges denial of due process through "the prosecutor's lies during the closing argument." (Id. p. 30.) As Ground Four, he alleges denial of effective assistance of counsel in several respects. (Id. p. 34.) As Ground Five, he alleges cumulative error violated his due process rights. (Id. p. 43.)

On December 26, 2012, Jackson filed a "Motion For Certificate of Appealability." (Dkt No. 21.) His anticipatory request that "if his Petition is denied," the "Court should grant a certificate of appealability to all portions of each claim raised" is premature, but should be addressed in the Court's order. 28 U.S.C. § 2253; see Rules Governing Section 2254 Cases in U.S. District Court, Rule 11.

## II.    DISCUSSION

### A.    Legal Standards For Federal Habeas Relief

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal habeas courts may not "reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 68 (1991). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76, (2005).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs review of Jackson's

claims because he filed his federal habeas petition after that statute's 1996 effective date.  Lindh v. Murphy, 521 U.S. 320, 322-23 (1997).  AEDPA imposes a " 'highly deferential standard for evaluating state-court rulings,' " requiring "that state-court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002), *quoting* Lindh, 521 U.S. at 333 n.7.  Habeas corpus is a " 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  Harrington v. Richter, 562 U.S. __, 131 S.Ct. 770, 786 (2011), *quoting* Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring).  "AEDPA prevents defendants -- and federal courts -- from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."  Renico v. Lett, 559 U.S. __, 130 S.Ct. 1855, 1866 (2010).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington, 131 S.Ct. at 786-87.

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."  Richter, 131 S.Ct. at 784.  Habeas relief is available under the first exception if the state court result "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *see* Lockyer v. Andrade, 538 U.S. 63, 73-76 (2003); *see also* Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (distinguishing the 28 U.S.C. § 2254(d)(1) "contrary to" test from its "unreasonable application" test).  A lack of holdings from the Supreme Court on the issue presented precludes relief under 28 U.S.C. § 2254(d)(1).  Carey v. Musladin, 549 U.S. 70, 77 (2006); *see* Moses, 555 F.3d at 754 ("[W]hen a Supreme Court decision does not 'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context required by the Supreme Court . . . it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue," and the federal habeas court "must defer to the state court's decision").  "Circuit precedent may provide 'persuasive authority' for purposes of determining whether a state court decision is an 'unreasonable application' of Supreme Court precedent", but "only Supreme Court holdings are binding on state courts, and 'only those holdings need be reasonably

applied.' " Rodgers v. Marshall, 678 F.3d 1149, 1155 (9th Cir. 2012) (citation omitted).  To be found an "unreasonable application" of the controlling precedent, the state court decision must have been "more than incorrect or erroneous;" it "must have been 'objectively unreasonable.' " Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citations omitted).

Under the second AEDPA exception, relief is available only if the state court based its result "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding, § 2254(d)(2)."  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (The question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold").

Federal courts apply AEDPA standards to the "last reasoned decision" by a state court. Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005); see Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim [are presumed to] rest upon the same ground").  Federal habeas courts reviewing prisoners' claims under 28 U.S.C. § 2254 apply the harmless error standard of Brecht v. Abrahamson, 507 U.S. 619 (1993) to "assess the prejudicial impact of constitutional error in a state-court criminal trial."  Fry v. Pliler, 551 U.S. 112, 121 (2007); see Baines v. Cambra, 204 F.3d 964, 977 (9th Cir. 2000) (the Ninth Circuit applies the Brecht harmless error standard "uniformly in all federal habeas cases under in all 28 U.S.C. § 2254").  Thus, even if constitutional error occurred, the petitioner must still demonstrate prejudice from that error, that is, that the error "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 623, 637 (internal punctuation and citation omitted).

### B.    No Evidentiary Hearing Warranted

Jackson argues that the Court "should grant the relief requested here, or in the alternative an evidentiary hearing." (Pet. 44, ECF No. 1.)  He reiterates in his Traverse his request for an evidentiary

hearing "to all the claims in this petition." (Traverse 4, ECF No. 19.) He mistakenly believes he must be permitted "to develop[] the facts and recover the evidence as alleged in the petition, as mandated by 'Town[send] v. Sain' and its progeny." (Traverse 5, ECF No. 19; *see* Townsend v. Sain, 372 U.S. 293, 312, 318 (1963), *overruled by* Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992). The Townsend case was decided under pre-AEDPA standards, when federal habeas courts had discretion to hold evidentiary hearings "subject to some judicially-created limitations on that discretion." Baja v. Ducharme, 187 F.3d 1075, 1077-78 (9th Cir. 1999). "However, as amended by the AEDPA, 28 U.S.C. § 2254(e) now substantially restricts the district court's discretion to grant an evidentiary hearing" and prescribes the manner in which federal courts must approach the factual record. Id. at 1075, 1077; *see* Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1401 n.8 (2011).

"[A] determination of a factual issue made by a State court shall be presumed to be correct," with the "applicant [having] the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In addition, "[b]ecause a federal court may not independently review the merits of a state court decision without first applying the AEDPA standards, a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts." Earp v. Ornoski, 431 F.3d 1158, 1166-67 (9th Cir. 2005), *citing* Lockyer, 538 U.S. at 71; *see* Schriro, 550 U.S. at 474 ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate"). "In practical effect, . . . this means that when the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.' " Cullen, 131 S.Ct. at 1399, *quoting* Schriro, 550 U.S. at 474.

In reliance on Cullen, Respondent argues Jackson is not entitled to an evidentiary hearing because federal habeas review is limited to the record that was before the state court that adjudicated the claim in the merits. (Ans. 19, ECF No. 12-1); *see* Cullen, 131 S.Ct. at 1400 ("[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review" to determine whether a claim adjudicated by the state court was contrary to or involved an unreasonable application of clearly established federal law). If a claim subject to 28 U.S.C. § 2254(d)(1) "does not satisfy that statutory

requirement, it is "unnecessary to reach the question whether § 2254(e)(2) would permit a [federal] hearing on th[at] claim."[3]  Id., *quoting* Williams, 529 U.S. at 444.  For the reasons discussed below, it is recommended the Court find that none of Jackson's claims warrants federal habeas relief pursuant to 28 U.S.C. § 2254(d)(1).  By its terms, 28 U.S.C. § 2254(d)(2) restricts federal habeas review to the state court record.  As he does not satisfy the exacting AEDPA standards prerequisite to receiving an evidentiary hearing, the request should be **DENIED**.

### C.    Exclusion Of Evidence Claims

#### 1.    Legal Standards

A state trial court's evidentiary rulings ordinarily do not present a federal question cognizable on federal habeas review.  *See* Estelle, 502 U.S. at 67-68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States").  Trial courts retain considerable discretion to admit or to exclude evidence.  Only if the trial court committed an error in that regard which rendered the trial so arbitrary and fundamentally unfair that it violated federal due process is relief warranted.

When a petitioner challenges the admission of particular evidence, reviewing federal courts will not find a due process violation as long as the challenged evidence is relevant to an issue in the case and a permissible inference can be drawn from that evidence.  Estelle, 502 U.S. at 70; *see* Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir.1991) (Where several inferences arise from admitted evidence, the jury is relied upon to "sort them out in light of the court's instructions"); *see also* Lisenba v. California, 314 U.S. 219, 236 (1941) ("The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false").  "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process."  Jammal, 926 F.2d at 920.

Similarly, when a petitioner challenges the exclusion of particular evidence, the trial court's

---

[3]  "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that . . . the claim relies on . . . a factual predicate that could not have been previously discovered through the exercise of due diligence and . . . the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2254(e)(2).

decision must be so fundamentally unfair as to violate due process before federal habeas relief is warranted.  *See* Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir.1999); Moses, 555 F.3d at 757 (the exclusion of evidence "is unconstitutional only where it 'significantly undermined fundamental elements of the defendant's defense' "), *quoting* United States v. Scheffer, 523 U.S. 303, 315 (1998). "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." Scheffer, 523 U.S. at 308 (citations omitted); *see* Larson v. Palmateer, 515 F.3d 1057, 1065 (9th Cir.2008) (For purposes of federal habeas review, it is "irrelevant" whether the trial court's evidentiary ruling is correct or not under state law; the only question "is whether the ruling rendered the trial so fundamentally unfair as to violate due process") (citation omitted).  Even when the state trial court's erroneous evidentiary ruling is found to have violated the defendant's constitutional rights, the error is still evaluated by federal habeas courts under the Brecht "substantial and injurious effect or influence" on the jury's verdict standard.  Baines, 204 F.3d at 977.

### 2.    Ground One: Exclusion Of Evidence Of Victim's Methamphetamine Use

Jackson sought to introduce evidence at trial, through testimony from Vidrio and from a treating physician, that she abused methamphetamine and had tested positive for methamphetamine the day of the incident.  (Pet. 24, ECF No. 1.)  The trial court limited the inquiry into Vidrio's drug use to the 24 hour period prior to the incident.  (Id., citing RT vol. 1, 39-44.)

> After Vidrio denied any drug use that day, petitioner again sought to introduce evidence of her positive drug use via her physician.  Petitioner noted that regardless of the degree to which Vidrio may have been under the influence of methamphetamine at the time of the incident, the positive drug test result demonstrated that she had been untruthful about using drugs that day.  She was also in possession of narcotics the day of the incident. . . . The court erred in not allowing any further inquiry into Vidrio's use of methamphetamines prior to, and on the day of the incident.  (2 RT 202.)  [¶]  This error by the trial court cannot be deemed harmless and requires automatic reversal.

(Pet. 24, ECF No. 1.)

> The California Court of Appeal summarized the record before rejecting this claim:

> Defense counsel's request to admit evidence of Vidrio's methamphetamine use was initially based on a notation in the medical report prepared by Dr. Yang referring to "meth[amphetamine] abuse" by the victim.  Defense counsel told the court that he wanted to ask Vidrio if she had used methamphetamine on the night of the shooting.  The court responded that the notation in the medical report was sufficient to permit defense counsel to question Vidrio about methamphetamine use within 24 hours of the shooting because this could affect her ability to recall or perceive the incident, but the defense could not question her about past drug use.  However, the court ruled that if

Vidrio denied methamphetamine use within 24 hours of the shooting *and* there was evidence that she was a methamphetamine addict, the defense could seek to impeach her testimony on this point based on the notation in the medical report.  The court stated that prior to Dr. Yang's testimony, defense counsel should obtain more information from him to determine if there were indications that she was a methamphetamine addict.

During cross-examination at trial, Vidrio denied that she had used methamphetamine on the day or night of the shooting.  Thereafter, during a discussion outside the presence of the jury, the parties informed the court that Dr. Yang had stated the methamphetamine abuse notation in the medical report had been derived from a urine drug screen performed on Vidrio that tested positive for methamphetamine.  However, there was no measurement of the amount of methamphetamine, and Dr. Yang had no information about when or how much of the drug was used.  Defense counsel requested that he nevertheless be permitted to raise the issue of the positive test result with Dr. Yang and, based on the positive test result, impeach Vidrio's testimony that she had not used methamphetamine the day or evening of the shooting.  The prosecutor objected, asserting there was no evidence Vidrio used the drug the day of the incident and the positive drug screen could have been from drug use one or two days before the incident.  The court concluded the positive drug test should be excluded under Evidence Code section 352 because the evidence had little or no relevance without information concerning the amount of the drug that was used, when it was used, and what effect it would have.  The court stated that any small relevance was outweighed by the potential for prejudice and undue time consumption.

(Lodgment No. 5, slip op. at 8-10.)

Invoking his "Fifth, Sixth, and Fourteenth"Amendment rights to confront and to cross-examine witnesses, Jackson argues the trial court violated those constitutional rights.  (Pet. 25, ECF No. 1: "Exclusion of evidence which would impeach the prosecution's evidence is a violation of those rights" in his case).  The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. Const., Amend. 6.  Nevertheless,  "[t]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination based on concerns about, among other things, prejudice, confusion of issues, . . . or interrogation that is . . . only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 680 (1986).  Evidentiary rules can legitimately restrict a defendant's right to present relevant evidence.  Scheffer, 523 U.S. at 308; *see* Moses, 555 F.3d at 758-59.

Respondent argues this challenge to an evidentiary ruling of the trial court presents no federal question on which habeas relief may be granted, and even if the claim were cognizable, the decision of the California courts to reject the claim is objectively reasonable, requiring AEDPA deference from

this Court. (Ans. 20, ECF No. 12-1.)  The superior court rejected Jackson's claim in his habeas petition to that court that he was denied the right to a fair trial "based on the exclusion of evidence of the victim's methamphetamine use and prior criminal conduct" on grounds that the claim had been litigated in his appeal from his conviction, and he failed to demonstrate he satisfied any exception to the state law rule that "issues that were raised and litigated on direct appeal may not be revisited on habeas corpus." (Lodgment No. 10, slip op. at 3 (citations omitted).)

Contrary to Jackson's representation that "the California courts rejecting the claim by finding harmless error was not adjudicated on the merits" (Traverse 12, ECF No. 19), the court of appeal on direct review had thoroughly analyzed the issue. That court determined the trial court recognized that evidence the victim used methamphetamine near the time of the shooting would be relevant "to the issue of the victim's ability to perceive and recall what occurred," and thus important to "refut[e]. . . Vidrio's version of the incident." (Lodgment No. 5, slip op. at 8-11.) "Further, once Vidrio testified she had not used methamphetamine on the day or evening of the incident, evidence showing she was untruthful about her recent drug use could support an inference that she was also untruthful about not displaying the knife."  (Id.)  Although the court also observed that "it is not clear from the record whether defense counsel was asking to recall Vidrio and question her (as opposed to Dr. Yang) about the positive test result, and we are not certain the trial court would have precluded this cross-examination of Vidrio had it been clearly requested" (Id., slip op. at 12), the court nonetheless concluded:  "In any event, assuming arguendo there was error in the trial court's exclusionary ruling, it was harmless under any standard of review." (Id., slip op. at 13.)  In California, "For both reasonable and unreasonable self-defense, the defendant must have an actual belief in imminent peril, and the self-defense must cease once the defendant knows the perceived danger is over." (Id., citing inter alia In re Christian S., 7 Cal.4th 768, 783 (1974), People v. Gleghorn, 193 Cal.App.3d 196, 202 (1987).)

> Here, even if the jury was presented with the methamphetamine use evidence and used it to credit Jackson's claim that Vidrio had the knife out in a manner that appeared threatening to him, the record creates a compelling inference that Jackson did not actually believe he was in imminent danger and that he knew any perceived peril was over when he shot Vidrio [foreclosing a finding of self-defense].  Vidrio testified that as soon as she saw the gun, she turned to leave, and Jackson then shot her in the back.  Three eyewitnesses (as well as the medical evidence) corroborated that Vidrio's

back was turned towards Jackson when he shot the gun.  None of the witnesses, including Jackson himself, described any acts by Vidrio that suggested she was in a position to immediately stab Jackson when he shot her. . . . Once Jackson knew the perceived danger was over, he could no longer support a claim of reasonable or unreasonable self-defense.

(Lodgment No. 5, slip op. at 13-14:  "Given the strength of the evidence showing the victim's retreat and lack of imminent danger, there is no reasonable possibility that the jury would have credited Jackson's theories of reasonable or unreasonable self-defense even if it had heard the methamphetamine evidence and based thereon believed the victim had displayed the knife in a manner that Jackson perceived as threatening.")

For those reasons, the appellate court reasonably concluded that the trial court's "exclusion of the methamphetamine evidence did not affect the verdict," and that had the excluded evidence been admitted, it "would not have convinced the jury to reject the evidence showing premeditated attempted murder." (Lodgment No. 5, slip op. at 15.)  The court identified the "strong evidence that the shooting was premeditated rather than a mere response to the knife's display" as, among other things, that Jackson "brought a gun to the bar and planned to confront the victim," and he had a "history of assaulting and threatening to kill her."  (Id.)

Even if, as Jackson alleges, the "decision of the trial court not to allow the impeachment evidence was arbitrary and disproportionate to the purposes the [right to confront witnesses is] designed to serve" (Traverse 14, ECF No. 19), none of his cited authority supports disturbing the state court result.  28 U.S.C. § 2254(d)(1).  The cases are all distinguishable.  In Davis v. Alaska, 415 U.S. 308, 318 (1974), the Court found a violation of a defendant's constitutional right to confront witnesses where the trial court, relying on a state policy to protect the anonymity of juvenile offenders, had refused to allow any cross-examination of a key prosecution witness for purposes of highlighting possible bias that could have caused him to make a faulty identification of the defendant.  Here, Jackson was allowed to cross-examine Vidrio at trial, and there is no dispute who shot Vidrio.

In Chambers v. Mississippi, 410 U.S. 284, 295 (1973), another distinguishable case Jackson cites, the Court found a due process violation in the trial court's application of a state common-law "voucher" rule to erroneously deny the defendant's request to cross-examine a critical witness at his murder trial.   In this case, evidence that Vidrio may have been under the influence of

methamphetamine at the time Jackson shot her carries no comparably "critical" importance to his defense, and he was permitted to cross-examine her.  In Crane v. Kentucky, 476 U.S. 683, 687-92 (1986), the Court found the trial court's exclusion of evidence of the circumstances surrounding the defendant's confession to murder deprived him of his constitutional right to present a defense, but also held the error was subject to harmless error analysis.  The Crane opinion disposes of Jackson's additional representation, citing inter alia Arizona v. Fulminante, 499 U.S. 279, 310 (1991), that the trial court's decision in his case to exclude evidence on the relatively tangential issue of Vidrio's drug use was "structural error" that cannot be deemed "harmless error."  (Pet. 26, ECF No. 1.)  The Fulminante Court distinguished "structural defect(s) affecting the framework within which the trial proceeds" from "error[s] in the trial process itself," such as particular evidentiary rulings, which can be evaluated for their prejudicial effect on the outcome of a trial in consideration of the context in which they occurred.  Fulminante, 499 U.S. at 309-12.

This Court is bound by the state courts' interpretation of state law and must defer to their reasonable factual findings.  Bradshaw, 546 U.S. at 76; see Larson, 515 F.3d at 1065 ("The correctness of the trial court's evidentiary ruling as a matter of state law is irrelevant" to a finding of prejudicial constitutional error; federal habeas relief would only be available for such error if the ruling "rendered the trial so fundamentally unfair as to violate due process").  The exclusion of Vidrio's drug use evidence did not impair Jackson's ability to present his self-defense theories to the jury, Moses v. Payne, 555 F.3d at 758-60, and there is no reasonable probability on this record that a rational jury would have not have rejected Jackson's self-defense theories if only it had heard such evidence.  It is recommended the Court find that the state court determination that any error in the exclusion of this evidence was harmless is not contrary to nor an unreasonable application of United States Supreme Court precedent, is objectively reasonable, and that the Court therefore lacks authority to disturb the result.  Relief on Ground One should be **DENIED**.

### 3.   Ground Two:  Exclusion Of Evidence To Impeach Victim's Testimony

Jackson argues "the trial court further erred in excluding vital impeachment evidence and thereby denied [his] due process right to a fair trial."  (Pet. 27, ECF No. 1.)  In denying Jackson relief on direct review, the court of appeal summarized this controversy:

In addition to the methamphetamine use evidence, prior to trial the defense moved to admit impeachment evidence concerning the victim's alleged prior fraudulent misconduct. The misconduct evidence arose from a complaint filed by the district attorney in August 2006 alleging that Vidrio had fraudulently written and cashed checks using her ex-husband's (Marc Vidrio's) checks. The complaint was dismissed (apparently when Vidrio was in the hospital after being shot by Jackson). According to the prosecutor, the case was dismissed because Marc's daughters contradicted information provided by Marc. According to the defense, Marc told a defense investigator that he did not understand why the charges were dismissed because there was a strong case against his ex-wife.

(Lodgment No. 5, slip op. at 15-16.)

As with the Ground One evidentiary challenge, Respondent argues Jackson's evidentiary ruling challenge raises no federal question for which relief may be granted. (Ans. 30, ECF No. 12-1.) Even if the claim were cognizable, Respondent argues no error occurred. (Id. p. 31.)

Under California law, "evidence of a witness's criminal conduct involving moral turpitude is generally admissible to attack credibility," but trial courts have discretion under Cal. Evid. Code § 352 "to exclude the evidence if it is unduly prejudicial, confusing or time consuming." (Lodgment No. 5, slip op. at 16 (citations omitted).) The court of appeal relied on People v. Brown, 31 Cal.4th 518, 545-46 (2003) for the proposition that: "Exclusion of evidence under Evidence Code section 352 does not contravene a defendant's constitutional rights unless the defendant can show that the excluded evidence would have produced a significantly different impression of the witness's credibility." (Lodgment No. 5, slip op. at 16.) Jackson identifies no United States Supreme Court authority contrary to that principle. See Van Arsdall, 475 U.S. at 679 (trial courts may impose reasonable limits on witness cross-examination).

"When deciding whether to admit misconduct evidence to impeach a witness, the trial court must make a preliminary fact determination that there is sufficient evidence to sustain a finding the misconduct occurred." (Lodgment No. 5, slip op. at 17 (citation omitted).) In upholding the trial court's ruling, the court of appeal observed that the evidence was not conclusive whether Vidrio had actually committed the alleged fraud. The district attorney's office represented that those charges had been dismissed for insufficient evidence. A lengthy hearing involving several witnesses would have been required to confirm whether that misconduct had actually occurred and, unlike the methamphetamine use evidence, the fraud evidence "did not concern the circumstances surrounding

17

the offense, but was merely general impeachment evidence." (Id.) The court of appeal noted the trial court's "careful evaluation of the evidentiary issues" and concluded "the trial court did not abuse its discretion by excluding the evidence on the basis that the potential for undue time consumption outweighed probative value" pursuant to the state evidentiary rule. (Id.) The court found "Jackson has not shown the excluded evidence would have produced a significantly different impression of Vidrio's credibility to support a constitutional violation," and declined to assume, as Jackson urged, that the trial court had "an improper motive" for excluding the evidence. (Id. pp. 17-18.)

A trial court's exclusion of otherwise appropriate impeachment evidence raises a constitutional concern only if that evidence might have caused a reasonable jury to "receive a significantly different impression of the witness's credibility than it would have received had the evidence not been excluded," Van Arsdall, 475 U.S. at 680, and its exclusion "significantly undermined fundamental elements of the accused's defense." Scheffer, 523 U.S. at 315. Jackson represents that his "entire defense at trial was based on self-defense," and the defense "was supported by both his own testimony as well as that of Vidrio" because she "admitted on cross-examination that she had her hand on an open knife in her waistband as she walked out of the bathroom and approached petitioner, immediately before petitioner shot her." (Pet. 27, ECF No. 1.) "[T]he case turned on the differing versions of exactly what Vidrio did with the knife as she approached the petitioner." (Id.) He contends the excluded evidence would have impeached the veracity of Vidrio's version of events. Jackson vastly overstates the alleged import of that tangential evidence as "crucial" and "vital" to his defense and "essential for a fair trial." (Pet. 28, ECF No. 1.) The other three other eye witnesses testified they saw no knife, consistent with Vidrio's testimony. The state courts reasonably determined that the impeachment value of the dropped check fraud charges was insufficiently probative to warrant the time that would necessarily be consumed trying to substantiate that alleged misconduct. Jackson has not established constitutional error occurred in the exclusion of that evidence, let alone that its exclusion so infected his trial with unfairness as to violate due process. Moses, 555 F.3d at 757–60.

A federal habeas court may not reweigh the evidence nor substitute its own view of the evidence for that of a jury or of a state reviewing court. Jammal, 926 F.2d at 920; see Scheffer, 523 U.S. at 308, 315. It is recommended that the Court find the state court results resolving both of

Jackson's evidentiary challenges are not contrary to nor an unreasonable application of United States Supreme Court precedent and are objectively reasonable. This Court consequently lacks authority to disturb those results. Accordingly, relief on Ground Two, as on Ground One, should be **DENIED**.

### D.      Ground Three:  Prosecutorial Misconduct

Jackson alleges he "was denied due process by the prosecutor's lies during the closing argument, designed to mislead the jury of [sic] his credibility." (Pet. 30, ECF No. 1.) He relies for this claim on the prosecutor's particular remarks commenting on the state of the defense evidence.

> During closing arguments, referring to [statements purportedly recorded in a police report of a deputy's interview with prosecution witness Michael Grimaldi[4]], with total disregard for the truth, makes [*sic*] deceptive and misleading statements to the jury when she stated, "The defendant tells you that after he shoots at Karen, that this man Mike comes at him again, is able to get his hand around this gun and actually points the gun at him and pulls the trigger and says, "You're dead". Does that make any sense ladies and gentlemen? That a stranger, who has no connection to the defendant at all, is now going to try and kill him? That makes absolutely no sense."
>
> . . . .
>
> Still referring to the altercation with Grimaldi, the prosecutor continued to lie to the jury in her attempt to attack the petitioner's version of events by stating, "That never happened" and "Now that is absolutely ridiculous, that makes no sense whatsoever" and "There is no one who has corroborated any of that. The defendant is the only one who told you about that story and the reason that nobody else was able to tell you anything about it is because it didn't happen." (People's closing argument 45, 46)[.] [¶] The prosecutor further lied when she summed it up for the jury with a final statement of deceit, "And all this nonsense that he told you is complete nonsense and there is no evidence to support anything he told you today."

(Pet. 30-31, ECF No. 1.)

As a threshold matter, Respondent argues Jackson's prosecutorial misconduct claim is not exhausted and is procedurally defaulted, foreclosing federal habeas relief. (Ans. 33-36, ECF No. 12-1.) In order to satisfy the exhaustion prerequisite to obtaining federal habeas relief, a petitioner must first "provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." Anderson v. Harless, 459 U.S. 4, 6 (1982). "To 'fairly present' [a] federal claim to the state courts," a petitioner must not only articulate the factual basis for the claim

---

[4]  "Immediately following the incident . . . , Michael Grimaldi (prosecution witness) was interviewed by Deputy Reed of the San Diego Sheriff's Department. In that report Grimaldi said he grabbed the hand gun and twisted the gun towards Jackson's chest, and Jackson told him, 'I'm already dead'. Both the prosecutor and the defense attorney had this police report in their possession and were aware of the statements made by Grimaldi (see Exhibit A)." (Pet. 30, ECF No. 1.)

12cv1701-DMS(NLS)

and but also must "alert the state courts to the fact that he [is] asserting a claim under the United States Constitution." Hiivala v. Wood, 195 F.3d 1098, 1106 (9th Cir. 1999) (per curiam), *citing* Duncan v. Henry, 513 U.S. 364, 365-66 (1995).

"A petitioner has satisfied the exhaustion requirement if:  (1) he has 'fairly presented' his federal claim to the highest state court with jurisdiction to consider it, or (2) he demonstrates that no state remedy remains available." Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996) (citations omitted).  Claims that were not presented in state court and that would now be barred from being presented under state law rules are technically exhausted, but procedurally defaulted.  Federal habeas review of procedurally defaulted claims is foreclosed, "unless the petitioner can show cause and prejudice" to excuse the default.  Cooper v. Neven, 641 F.3d 322, 327 (9th Cir. 2011); *see* Coleman v. Thompson, 501 U.S. 722, 732, 750 (1991).

Jackson presented this claim in a supplement to his superior court habeas petition. (*See* Lodgment No. 9, Supplement, In re Jackson, No. EHC753.)  He complained again about the prosecutor's closing argument in his habeas petitions to the court of appeal and to the California Supreme Court, but only as one of his examples of alleged IAC, contending that his counsel "fail[ed] to object" to the prosecutor "attack and barrage on petitioner's credibility during closing." (Lodgment No. 13, slip op. at 1; *see* Lodgment No. 14, handwritten p. 11 foll. form petition and exhibits.) Jackson did not raise his prosecutorial misconduct claim as a discrete constitutional ground for post-conviction relief in the California Supreme Court, either on direct or on collateral review.  (*See* Lodgment Nos. 6, 14.)  The claim is therefore unexhausted.  Moreover, the San Diego County Superior Court's procedural bar rationale for rejecting this claim when he presented it in his April 2010 habeas petition to that court substantiates that a return to state court at this late date to attempt to exhaust the claim would be futile.  That court concluded Jackson failed to show any special circumstance that would warrant the court's deviation from the state law rule "that habeas corpus cannot serve as a substitute for an appeal, and that matters that 'could have been, but were not, raised on a timely appeal from a judgment of conviction' are not cognizable on habeas corpus." (Lodgment No. 10, slip op. at 3, *citing* In re Clark, 5 Cal.4th 750, 765  (1993), In re Dixon, 41 Cal.2d 756, 759 (1953), In re Walker, 10 Cal.3d 764, 773 (1974).)

Jackson attempts to avoid this obstacle to federal habeas relief by insisting that the "claim of prosecutorial misconduct during closing argument was exhausted under the auspices of ineffective assistance of counsel in the state courts." (Pet. 32, ECF No. 1.)

> If the claim of prosecutorial misconduct is not deemed exhausted in state court, then petitioner claims ineffective assistance of counsel. [¶] If the claim of prosecutorial misconduct should have been raised on state appeal, then petitioner was denied effective assistance of appellate counsel.

(Pet. 32, ECF No. 1.)

The standards and considerations for finding prosecutorial misconduct during closing argument were recently and concisely collected in United States v. Phillips, __ F.3d __, 2012 WL 6700220 * 10 (9th Cir. (Wash.) Dec. 26, 2012). "[T]he prosecutor must have reasonable latitude to fashion closing arguments." United States v. Moreland, 622 F.3d 1147, 1161 (9th Cir. 2010), *quoting* United States v. Molina, 934 F.2d 1440, 1445 (9th Cir. 1991). However, "a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of [government] witnesses." Id., *quoting* United States v. McKoy, 771 F.2d 1207, 1211 (9th Cir. 1985). Nevertheless, it is "neither unusual nor improper for a prosecutor to voice doubt about the veracity of a defendant who has taken the stand." United States v. Birges, 723 F.2d 666, 672 (9th Cir. 1984). The prosecution may even refer to a defendant as a "liar" if it is "commenting on the evidence and asking the jury to draw reasonable inferences." Moreland, 622 F.3d at 1161, *quoting* United States v. Garcia-Guizar, 160 F.3d 511, 520 (9th Cir. 1998); *see also* United States v. Rude, 88 F.3d 1538, 1548 (9th Cir. 1996).

Jackson's IAC arguments do not overcome his failure to present the state courts with the factual basis and legal theory for an independent prosecutorial misconduct claim, nor does he show cause and prejudice to excuse the default. Coleman, 501 U.S. at 750; Cooper, 641 F.3d at 327.

Although a federal habeas court cannot grant relief on an unexhausted constitutional claim, it may deny relief. 28 U.S.C. § 2254(b)(2) (an application for habeas corpus may be denied on the merits, notwithstanding a petitioner's failure to exhaust in state court); *see* Bell v. Cone, 543 U.S. 447, 451 n.3. (2005) (same). Even if the Court were to reach the merits of Jackson's prosecutorial misconduct claim, it is factually meritless. Federal habeas courts review challenged conduct by prosecutors in the context of the entire trial. *See, e.g.*, Greer v. Miller, 483 U.S. 756, 765-66 (1987);

Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Boyde v. California, 494 U.S. 370, 384-85 (1990).  Prosecutorial misconduct during closing argument can form the basis for federal habeas relief from state court convictions only if the prosecutor's comments were improper and "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986), *quoting* Donnelly, 416 U.S. 637.

Jackson urges the Court to rely on the police report attached to his Petition as the basis for his claim that the prosecutor purportedly lied to the jury to improperly discredit him.  The pertinent portion of that  report records:

> GRI[MA]ldi said he saw VIDRO [sic] come out of the restroom and walk toward the bar.  GRIMALDI saw JACKSON reenter the bar and walk up behind VIDRO. GRIMALDI saw JACKSON pull out a firearm, point the firearm at VIDRO, and pull the trigger.  [¶]  GRIMALDI said he immediately left the bar and tackled JACKSON and held him on the ground.  GRIMALDI said he grabbed the handgun and twisted the gun toward JACKSON's chest.  [¶]  GRIMALDI said JACKSON told him, "I'm already dead."  GRIMALDI said he and another male pushed JACKSON toward the rear door.  GRIMALDI said he was able to get the gun out of JACKSON's hand and threw the gun toward the bar.

(Pet. 47, Exhibit A p. 2, ECF No. 1.)

Grimaldi's trial testimony describing the incident did not cover any verbal exchange between Jackson and himself at the time Grimaldi disarmed him.  (Lodgment No. 16, RT vol. 2, pp. 121-137.) However, Jackson's own testimony included his rendition of a verbal exchange he had with Grimaldi. He testified that after he shot Karen, purportedly in self-defense when he saw and felt threatened by the opened knife he said she was holding in front of her, "Mike grabs the gun and my hand with two hands. . . ."  (Id., RT vol. 3, p. 253.)

> A.      He turns the gun and my hand into my chest like this.  You know, I only have one hand on the gun, okay, because I'm like, kind of shocked, you know, at what's going on.
>
> . . . .
>
> A.      . . . Anyway, okay, he had the gun aimed at my chest.  Okay, and my finger was still in the trigger, okay, and he put his finger on top of mine, all right.
>
> Q.      Let me stop you, did anything happen at that point once your finger is on the trigger and his is on top of your finger?
>
> A.      Yes, sir.
>
> Q.      What happened?

22

1   A.   He said, "You are dead," and he pulled the trigger.

2   Q.   Did anything happen?

3   A.   Nothing happened, the gun did not fire.

4   Q.   What happened after that?

5   A.   Well, he said "You are dead," then I answered by saying, "I'm already dead."

6   Q.   Why did you say that?

7   A.   Well, I don't know, maybe I was being a smart ass or something, I don't know.

8   (Lodgment No. 16, RT vol. 3, pp. 254-255, 290 ("The only one that was actually doing anything was

9   Mike.  He tried to shoot me in the chest.").)

10   The record thus belies Jackson's contention the prosecutor "fabricated remarks" during closing

11   argument.  (Traverse 20, ECF No. 19.)  Contrary to his contention that the prosecutor misrepresented

12   the evidence, the trial transcript reveals the prosecutor accurately summarized Jackson's own

13   testimony in her closing argument.  Respondent argues: "Thus, when the prosecutor threw cold water

14   on such an explanation in closing argument, she was well within her rights to argue to the jury that

15   what Jackson had testified to made no sense."  (Ans. 38, ECF No. 12-1.)  Even if error occurred, jury

16   instructions form part of the context within which to assess the harmlessness of such errors.  "A jury

17   is presumed to follow its instructions."  Weeks v. Angelone, 528 U.S. 225, 234 (2000).  As the Phillips

18   court observed on the facts of that case:

19       Moreover, the judge had specifically instructed the jury that the statements by
         either attorney in closing argument were not to be considered as evidence, and that the
20       only evidence properly considered was the testimony of the witnesses, the exhibits, and
         any stipulations.  This instruction also helped to ensure that any error did not affect the
21       outcome of [the] trial.  *See Moreland*, 622 F.3d at 1162.

22   Phillips, 2012 WL 6700220 at *10, n.12.

23   Similarly here, Jackson's trial court instructed the jury:

24   "Evidence" is the sworn testimony of witnesses, the exhibits admitted into evidence,
     and anything else I told you to consider as evidence.  [¶]  Nothing that the attorneys
25   say is evidence.  In their opening and statements and closing statements, the attorneys
     discuss the case, but their remarks are not evidence.  Their questions are not evidence.
26   Only the witnesses' answers are evidence. . . .

27   (Lodgment No. 16, RT vol. 4, pp. 379-380.)

28   As demonstrated above, no prosecutorial misconduct occurred in the manner Jackson alleges.

He mistakenly characterizes as "lies" the prosecutor's accurate description of Jackson's own testimony about the verbal exchange and manipulations of the gun by Grimaldi and himself after Jackson shot Vidrio.  The characterization of Jackson's version of events as "nonsense" did not invade the jury's role as the arbiter of credibility.  Jackson identifies no United States Supreme Court authority that compels a different result.  Relief on Ground Three should be **DENIED**.

### E.   Ground Four:  Ineffective Assistance Of Counsel

#### 1.   Legal Standards

A defendant claiming IAC must demonstrate both (1) deficient performance under an objective standard of reasonableness and (2) prejudice.  Strickland, 466 U.S. at 687.  To satisfy the deficient performance requirement, "[t]he challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' "  Richter, 131 S.Ct. at 787, *quoting* Strickland, 466 U.S. at 687.  To demonstrate prejudice, the petitioner must show that "but for counsel's unprofessional errors," there is a reasonable probability "the result of the proceeding would have been different." Strickland, 466 U.S. at 690.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694; *see* Richter, 131 S.Ct. at 792 ("The likelihood of a different result must be substantial, not just conceivable").  "Because failure to meet either [Strickland] prong is fatal to [an IAC] claim, there is no requirement that we 'address both components of the inquiry if the defendant makes an insufficient showing on one.' "  Gonzalez v. Wong, 667 F.3d 965, 987 (9th Cir. 2011), *quoting* Strickland, 466 U.S. at 697; *see* Bell v. Cone, 535 U.S. 685, 694 (2002) ("Without proof of both deficient performance and prejudice to the defense . . . the sentence or conviction should stand") (citation omitted).

Courts resolving an IAC claim do not inquire into what means and strategies defense counsel might have pursued, but rather they assess whether the choices counsel actually made were reasonable. Siriprongs v. Calderon, 133 F.3d 732, 736 (9th Cir. 1998).  There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and reviewing courts defer to counsel's reasonable tactical decisions.  Strickland, 466 U.S. at 689.  On federal habeas review, "[t]he question 'is not whether a federal court believes the state court's determination' under Strickland 'was incorrect but whether [it] was unreasonable -- a substantially higher threshold.' "

Knowles v. Mirzayance, 556 U.S. 111, 112 (2009), *quoting* Schriro, 550 U.S. at 473; Bell, 535 U.S. at 699 (In order to prevail on an IAC claim, the petitioner "must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner").

Moreover, "[f]ederal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." Richter, 131 S.Ct. at 788 (reversing a Ninth Circuit en banc grant of habeas relief on an IAC claim for lack of sufficient deference to the state court result). "[T]he question is not whether counsel's actions were reasonable," but rather "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." Id.; *see* Cullen, 131 S.Ct. at 1403 ("We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d)'") (citation omitted); Mirzayance, 556 U.S. at 123 (when Strickland and AEDPA apply in tandem, review is "doubly" deferential). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." Richter, 131 S.Ct. at 791, *quoting* Strickland, 466 U.S. at 686.

### 2.      Failure To Investigate And Present Mental Deficiency Evidence

Jackson does not challenge the sufficiency of the evidence to support his conviction. Rather, he contends he provided information to his attorney identifying friends and family members who were willing to testify that he had a long history of mental illness which "could raise doubt in regards to the intent element of a crime." (Pet. 35, ECF No. 1.) He argues that had his attorney properly investigated, "he would have discovered that petitioner suffered from recurrent major depression, recurrent anxiety and panic attacks, paranoia, personality disorders, audio hallucinations, post traumatic stress, and alcohol abuse." (Id. ("At the very least, [counsel] could and should have interviewed petitioner's physicians to confirm his mental illness and to determine the likelihood that it may have been a contributing factor in the instant case").) The claim presumes his attorney did not consider then strategically reject a mental impairment defense.

Jackson received a reasoned decision from both the San Diego County Superior Court and the California Court of Appeal denying habeas relief on this issue. Applying the IAC review standards from Strickland, 466 U.S. 668, those courts found: that Jackson failed to provide sufficient competent evidence to support his contention he had mental health issues at the time he committed the October

2006 crime; that he failed to show his attorney's decision to defend the case by asserting only self-defense was not made after a full review of the case based on counsel's informed tactical decision; that he failed to show his attorney's acts or omissions resulted in the withdrawal of a potentially meritorious defense; and that counsel was not required to investigate all prospective witnesses. (Lodgment No. 10, slip op. at 4-6; Lodgment No. 13, slip op. at 2.)

> Regarding petitioner's contention that his counsel should have investigated and presented a mental health defense, petitioner contends that a psychological evaluation was conducted on him at the California Institute for Men and that his attorney "should have read that report . . . ." The report indicates that petitioner had anger management issues, substance abuse problems and engaged in self-destructive behavior.
>
> However, there is nothing demonstrating that counsel had or even knew about this report, or that these psychological assessments would present a valid defense. Moreover, the report was created in October 2002, after petitioner was convicted of false imprisonment of a hostage and first degree burglary. The report does not show that petitioner had mental health issues when he committed the instant offense in October 2006. Similarly, none of the documents that petitioner submitted in his supplement show any mental health problems after 2002. Petitioner fails to state a prima facie case that counsel was ineffective for failing to investigate or present a mental health defense. (*Strickland v. Washington, supra*, 466 U.S. at p. 687; *People v. Duvall* (1995) 9 Cal.4th 464, 474-75.)[5]

(Lodgment No. 13, slip op. at 1-2.)

This Court may disturb the state court result on this issue only if it is contrary to or an unreasonable application of Strickland, based on the record before the state courts. Cullen, 131 S.Ct. at 1400 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court"). The dispositive question here is "whether there is any reasonable argument that counsel satisfied *Strickland*"s deferential standard." Richter, 131 S.Ct. at 788.

Jackson must overcome the presumption that counsel's action were the result of reasonable choices, and he cannot do so merely by identifying other strategies counsel could have pursued. *See* Siriprongs, 133 F.3d at 736. Defense counsel adopted the reasonable trial strategy to defend the case

---

[5]  At Jackson's new trial motion and sentencing hearing, the prosecutor noted that trial counsel "did actually do an investigation to determine whether there was any type of mental defense." (Lodgment No. 16, RT vol. 10, p. 475.)  "There was a 1368 competency hearing, which although it was a different standard, there were psychological evaluations conducted. At no time. . . in the last six years, other than some anxiety, some possible depression, and some hypertension, there were no other disorders, mental illnesses of any kind whatsoever that this defendant suffered from that would have any impact on him going forward with the trial and on him having any kind of defense at the time the crimes were committed." (Id.)

consistent with Jackson's contention he shot Vidrio in self-defense, and mounted a competent presentation of that theory.  Counsel presented evidence in support of criminal exoneration or a lesser degree of culpability for the shooting, among other things by calling a psychiatric expert to testify about the phenomenon of "fight or flight" stress responses to perceptions of threat and fear. (Lodgment No. 16, RT vol. 3, pp. 320-330.)  Defense counsel posed a hypothetical embodying the essential elements of Jackson's version of his and Vidrio's conduct at the time of the shooting.  (Id. p. 327-328.)  If a jury believed the facts as Jackson described them -- that he shot Vidrio in response to seeing her with an open knife about three or four feet away from him -- the expert's testimony could have undermined the premeditation and deliberation elements of an attempted murder offense. Relying entirely on vague inference, Jackson attempts no showing of how the various types of mental health issues he has purportedly exhibited at various stages in his life could have convinced a factfinder that he was thereby prevented from forming the requisite premeditation and deliberation required for a valid attempted murder conviction when he admittedly shot Vidrio.

The jury received conflicting evidence from which it could -- and did -- reasonably reject Jackson's self-defense theories based as they were entirely on his own testimony in consideration of considerable countervailing testimony from other witnesses as well as medical evidence substantiating Vidro was shot in the back.  Even if counsel could have decided to exploit Jackson's mental health instead of or in addition to the self-defense theories, Jackson has not demonstrated either constitutionally deficient representation or the prejudice required for relief under the Strickland test. It is accordingly recommended that his IAC claim on this theory be **DENIED**.

### 3.      Failure To Inform Of Potential For Self-Incrimination

Jackson alleges his "Fifth Amendment right to be free from self-incrimination was violated" when his attorney allegedly told him he needed to testify on his own behalf purportedly without also telling him "that by testifying he would have to say he was armed before going to the bar . . ., which would subject him to a 25 years-to-life sentence (under the three-strikes law for possession of a firearm by a felon), even if the jury acquitted him of all other charges."  (Pet. 37, ECF No. 1.) Jackson's petition for direct review in the California Supreme Court raised no IAC claim on any theory. (Lodgment No. 6.)  This Court's review of his habeas petition to that court reveals no clear

statement of this IAC claim.  (Lodgment No. 14.)  Although Respondent argues the merits of this claim without alluding to any treatment of it by any state court (Ans. 44-46, ECF No. 12-1), Jackson appears not to have exhausted the claim.

Even if the court were to reach the merits of the claim, it does not warrant habeas relief. Jackson argues "[n]o experienced, competent, informed trial attorney would have allowed his client to incriminate himself" by admitting to being a felon-in-possession in such a way," and his counsel "should not have led him to believe that there was no down-side to testifying and self-incriminating." (Pet. 37, ECF No. 1.)  He represents that he "would never have agreed to testify and incriminate himself" as possessing a firearm had he known of the alleged consequences of his status.  (Id. pp. 37-38.)  He argues the emphasis of his defense "should have been on Vidrio being the first ag[g]ressor, after all it was her plot," and purportedly "[a]ny competent attorney would have figured that out." (Traverse 26, ECF No. 19.)  Jackson fails to reconcile that deficient performance allegation with the fact that the self-defense theories trial counsel pursued were necessarily predicated on "Vidrio being the first ag[g]ressor."  Jackson adds, with conclusory hindsight, that "[t]he bottom line here is this, there is absolutely no reason to testify, in your behalf if the best you can do is get sent to prison for life."  (Id. p. 27.)  That observation, irrespective of its dubious accuracy, has no bearing on the constitutionality of defense counsel's strategic choice to present the self-defense theories which Jackson continues to assert and which were wholly dependent on and supported solely by his own testimony.  The record discloses no evidentiary basis from which a reasonable factfinder could have concluded Jackson was not armed with a handgun when he went to the bar but for his admission that he arrived there carrying the gun.

More fundamentally, the claim lacks merit because sentencing decisions are not made by juries.  Post-conviction proceedings before the trial court addressed the issues of sentencing enhancements predicated on Jackson's prior convictions and his status as a felon in possession of a firearm.[6]  There is no reasonable likelihood of a different sentencing outcome after his conviction if

---

[6]  Jackson admitted going to the bar armed with a gun he had found in bushes by his mother's house at some earlier time.  He testified that when he found it, he thought  about what he should do with it because "I couldn't turn it in, because I'd just get arrested for, you know, being a felon in possession of a firearm," deciding instead to "lock[] it up in a [metal] box," from where he retrieved it the day he shot Vidrio.  (Lodgment No. 16, RT vol. 3, pp. 268-269.)  He thus admits he was aware of the potential criminal consequence of

Jackson had not testified. Jackson relies on wholly distinguishable authority in support of this claim. In Griffin v. California, 380 U.S. 609 (1965), the Court found comments by the trial court and the prosecutor on the defendant's *failure to testify* violated the self-incrimination clause of the Fifth Amendment.  In Bram v. United States, 168 U.S. 532 (1897), the Court addressed the voluntariness of a confession.  The issue here is not the voluntariness of Jackson's confession that he shot Vidrio but rather under what circumstances he shot her.  Finally, citing Blackburn v. Alabama, 361 U.S. 199, 205 (1960), Jackson argues "[t]he exclusionary rule also applies in state court to evidence obtained through a Fifth Amendment violation."  (Pet. 28, ECF No. 1.)  That Court addressed the constitutionality of submitting a defendant's confession to the jury over defense counsel's objection, an issue immaterial here.

In summary, the jury was not the factfinder on the issue of Jackson's status as a felon in possession of a firearm.  (*See* Lodgment 16, RT vol. 5, pp. 422-423.)   His prior criminal record as it affected his sentence was decided by the court in post-conviction proceedings unaffected by his trial testimony.  His trial testimony was essential to any hope of establishing he shot Vidrio in self-defense. Even if his attorney failed to tell him he faced more severe sentencing consequence if convicted due to his status as a felon, his decision to testify had no bearing on that consequence.  Jackson's meritless IAC claim on this theory should therefore be **DENIED**.

**4.      Failure To Object To Prosecutorial Misconduct During Closing Argument**

The prosecutor committed no misconduct during closing argument in summarizing Jackson's own trial testimony then discrediting his explanations as improbable,   as discussed above in connection with Ground Three.  Defense counsel's failure to object to unobjectionable argument cannot be deemed an instance of IAC.  In denying Jackson habeas relief on this claim, the court of appeal reasonably concluded:

> Petitioner's . . . contention that counsel should have objected to the prosecutor's comments during closing argument fails because petitioner makes no attempt to demonstrate prejudice except to state that jury deliberations took longer than the presentation of the evidence.  As we stated on direct appeal in our evaluation of prejudice:  "[w]e will not speculate as to the reasons for . . . the length of the deliberations." (*People v. Jackson, supra*, D0543799, at p. 8; see *People v. Fairbank*

---

carrying the gun independently of any attribution of ineffectiveness on the part of his attorney for advising him to present his self-defense explanation to the jury.

1           (1997) 16 Cal.4th 1223, 1241 [a court should proceed directly to the issue of prejudice
          if it is easier to dispose of an ineffective assistance of counsel claim on that basis].)

2

3 (Lodgment No. 13, slip op. at 2.)

4      Moreover, the jury was instructed to decide the facts of the case using "only the evidence that

5 was presented in this courtroom" and was advised that arguments of counsel are not "evidence."

6 (Lodgment No. 16, RT vol. 4, pp. 379-380.)   For all the foregoing reasons, this claim should be

7 **DENIED** for failure to satisfy either prong of the <u>Strickland</u> standard.

8         **5.**     **<u>Failure To Investigate And Present Evidence Of Victim's History Of
Violence</u>**

9

10      Jackson alleges IAC on the additional ground that his attorney did not bring out "that Vidrio

11 had a long history of violence, and that her aggressive, violent nature may have played a significant

12 role in circumstances that surrounded the events that day." (Pet. 39, ECF No. 1.)   He represents

13 counsel could "easily" have introduced that evidence "during petitioner's testimony. . . and through

14 her ex-husband, who could have testified."[7]  (<u>Id.</u>)  In addition, he argues counsel "could and should

15 have also brought in an expert witness to give testimony on the effect methamphetamines have on

16 people who use them, with regard to their aggressive and violent behavior, and with regard to the

17 significance of her positive drug screen at the hospital immediately following the incident." (<u>Id.</u>)  He

18 contends, "All of this evidence would have greatly strengthened petitioner's credibility with the jury,

19 and severely weakened Vidrio's." (<u>Id.</u>)

20      As discussed above in connection with Grounds One and Two, the reviewing state courts

21 acknowledged defense counsel's attempt to introduce certain impeachment evidence that was

22 reasonably excluded by the trial court, and further concluded no IAC occurred in that regard.

23           Regarding petitioner's contention that counsel should have introduced evidence
          of the victim's methamphetamine use and prior criminal conduct, petitioner cannot
24           show that his counsel was ineffective.  As we explained on direct appeal, counsel did
          move to admit such evidence.  (See *People v. Jackson* (Jan. 26, 2010, D053799)

25

26        [7]  At Jackson's new trial motion and sentencing hearing, the prosecutor provided the court with
substantiation that defense counsel did investigate possible impeachment evidence and "did speak with
27 [Vidrio's] ex-husband and got some information from him," in addition to information the prosecutor provided
the court substantiating that most of the evidence proffered by the defense in Jackson's new trial motion "dealt
28 with a criminal case that was dismissed against Ms. Vidrio for insufficiency of the evidence." (Lodgment
No. 16, RT vol. 10, p. 476.)

                    12cv1701-DMS(NLS)

> [nonpub. opn.].)  We concluded that, even assuming the court erred in refusing to admit the evidence, the error was harmless under any standard of review, in view of the strength of the evidence against petitioner. (*Ibid.*)  Given our holding on direct appeal on this issue, petitioner cannot show that counsel was deficient, or that he was prejudiced. (*Strickland v. Washington, supra,* 466 U.S. at p. 687.)

(Lodgment No. 13, slip op. at 2.)

Defense counsel's strategic decisions respecting the marshaling of evidence and the conduct of the trial defense do not rise to the level of constitutionally ineffective representation.  Concerning specifically Jackson's suggestion that his attorney ought to have presented more evidence about Vidrio's temperament and character and the violence of their relationship, courts resolving an IAC claim assess only whether the choices counsel actually made were reasonable, not whether other choices might also have been made.  Siriprongs, 133 F.3d at 736.  As Respondent observes: "Amplification on this point was a matter of trial tactics," and would not have been without risks to the defense due to Jackson's exposure to follow-up questions from the prosecution if his testimony about his relationship with Vidrio had strayed beyond his bare admission that he pled guilty to an earlier crime of violence against her.  (Ans. 46, ECF No. 12-1.)  Jackson cannot demonstrate that his attorney's decision to forego further elaboration of Vidrio's alleged volatility or the violent domestic history shared by Jackson and his victim constituted an "unprofessional error" falling outside the wide range of constitutionally adequate representation.  Strickland, 466 U.S. at 690.

Federal habeas relief on an IAC claim requires that a petitioner overcome the "double deference" this Court owes to both the legal representation received and the state court result concluding the representation was not so deficient as to have deprived the defendant of a fair trial.  Richter, 131 S.Ct. at 788; *see* Cullen, 131 S.Ct. at 1403.  Applying that standard, it is recommended the Court **DENY** relief on this IAC theory.

### 6.    Failure To Request Removal Of Juror No. 5

Jackson also alleges IAC for failure of his attorney "to request removal of Juror #5, who admitted to having outside information of victim, petitioner, trial attorney, and crime scene location." (Pet. 40, ECF No. 1.)  He argues the record discloses Juror No. 5 "had an implied bias towards the case, the people involved in the case, and possibly the defendant," purportedly leading "to a presumption of prejudice." (Id. p. 41.) Jackson argues  counsel should have "requested her immediate

removal from the jury panel due to her personal knowledge of the crime scene, her familiarity with the reputation of the business, and her implied bias towards the people who patronize the business (3 RT 296-301)."[8]  (Pet. 41, ECF No. 1.)

The last reasoned state court decision addressing this claim was the San Diego County Superior Court's rejection of Jackson's habeas corpus petition.  (Lodgment No. 10.)

> With regard to the claim that counsel was ineffective for not requesting Juror Number 5 be excused, Petitioner has not shown grounds for relief.  Petitioner has not shown he was prejudiced by the decision to have this juror remain on the jury.  The juror testified that she had the ability to judge the case based on the evidence presented at the trial.  In addition, the personal information she knew about the bar was favorable to the defense.  Thus, Petitioner has not shown grounds for relief.

(Lodgment No. 10, slip op. at 6.)

The trial court's statement of the case at the beginning of the trial had identified the site of the offenses as Shooter's bar on Jamacha Boulevard in Spring Valley.  (Lodgment No. 16, RT vol. 1, p. 13.)  The trial testimony included detail about the place and representations about its clientele.  Juror No. 5 and Juror No. 6 had apparently raised a hand during jury selection acknowledging they knew of the bar, causing the court to suggest those two jurors should probably be asked about the nature of their familiarity with the place in consideration of the testimony.  (Id. RT vol. 3, p. 294.)  The court held individual voir dire proceedings on the record for that purpose.  Juror No. 5 testified under oath that she did been inside the bar years before, did not care for the people there, and knew it to be a "tweaker" bar frequented by methamphetamine users.  (Id., RT vol. 3, p. 297.)  The court and counsel evaluated her statements, called her back, received her assurances that during deliberations, she could separate her own opinions from the evidence in the case and that she would not discuss her opinions with other jurors.  (Id., RT vol. 3, pp. 298-308.)  Neither the prosecutor nor defense counsel objected to her remaining on the jury.

Proceeding pro se after trial but before sentencing, Jackson filed a motion to compel disclosure of juror information so an investigator could question them, "particularly Juror No. 5. . . ."

---

[8]  In his Traverse, Jackson also suggests that in the portion of voir dire recorded but not transcribed, Juror No. 5 "stated she had a working relationship for several years with defense attorney Robert Berkon." (Traverse 30, ECF No. 19.)  Even if so, he fails to elaborate any consequent prejudice to his case.

(Lodgment No. 16, RT vol. 6, p. 462-2.)  The court  reviewed "in detail the pertinent portion of the trial transcript at pages 286 through 299, wherein the trial judge . . . addressed Jurors No. 5, and 6 individually, outside the presence of the other jurors, with most of the inquiry being focused upon Juror No. 5, concerning her knowledge, apart from the trial proceedings, of the bar, Shooters bar," before denying the motion.  (Id. pp.462-2-462-4.)  The court found Jackson did not establish good cause for the release of any juror identifying information, in general or "more particularly, as to Juror No. 5." (Id. p. 462-4.)

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961); Turner v. Louisiana, 379 U.S. 466, 471-72 (1965) (same).  "The bias or prejudice of even a single juror would violate [defendant's] right to a fair trial" under the Sixth Amendment. Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc).  Although the jury's verdict "must be based upon the evidence developed at the trial," it is "not required, however, that the jurors be totally ignorant of the facts and issues involved." Irvin, 366 U.S. at 722.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Id. at 723 (citation omitted).  A state trial judge's factual finding of juror impartiality is presumptively correct, reviewable by a federal habeas court only for "objective unreasonableness." Smith v. Phillips, 455 U.S.209, 218 (1982); 28 U.S.C. §2254(d).

Jackson's trial court conducted appropriate proceedings on the issue, and he identifies no clear and convincing evidence to rebut the presumption of correctness owed to the state court determination that Juror No. 5 manifested no bias adverse to him. See 28 U.S.C. § 2254(e)(1); cf. Dyer, 151 F.3d at 981 (the record conclusively established that one juror lied materially and repeatedly during voir dire, and her lack of candor in the challenged particulars gave rise to a finding of implied bias, overcoming the presumption of correctness on habeas review of a state court's finding the juror was impartial).

> A court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances . . . . [D]ue process requires only that all parties be represented, and that the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality. . . . So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness.

Dyer, 151 F.3d at 974-75, *citing inter alia* Remmer v. United States, 350 U.S. 377, 379 (1956), Smith, 455 U.S. at 217, 222 (Bias may be inferred from "exceptional" circumstances that "leav[e] serious question whether the trial court . . . . subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice"), (O'Connor, J., concurring); *see* Tinsley v. Borg, 895 F.2d 520, 526 (9th Cir. 1990).

Defense counsel participated in the questioning of Juror No. 5 and the record reflects her answers revealed no bias adverse to Jackson. (Lodgment No. 16, RT vol. 3, pp. 296-308.) Jackson does not challenge the adequacy of the process undertaken as a special voir dire proceeding during trial. He does not allege the juror lied or lacked candor. The facts of that juror's acquaintance with Shooter's bar and her ability and willingness to set aside her impressions were fully vetted at that proceeding, and Jackson identifies nothing that could be deemed "crucial," "vital" or "indispensable to a fair, rounded development" of the facts material to a bias determination. Townsend, 372 U.S. at 321-22. Even if counsel might have successfully sought her removal, unless a petitioner can show Strickland prejudice from counsel's allegedly deficient performance in not attempting to do so, relief is not warranted. Fields v. Brown, 503 F.3d 755, 776 (9th Cir. 2007). According the requisite deference on federal habeas review under AEDPA, both to counsel's performance in this regard and to the state court's resolution of this claim, Richter, 131 S.Ct. at 788, it is recommended relief on this ground be **DENIED**. The record falls far short of any "exceptional" circumstances leaving a "serious question" about whether "a miscarriage of justice" may have occurred in retaining Juror No. 5 on Jackson's jury. *See* Smith, 455 U.S. at 222; Tinsley, 895 F.2d at 527.

Concerning the entirety of Ground Four, it is recommended the Court find the state courts resolved all of Jackson's several IAC challenges presented there in a manner that comports with controlling United States Supreme Court precedent and is objectively reasonable. This Court therefore lacks authority to disturb the result. 28 U.S.C. § 2254(d). Relief on Ground Four should be **DENIED**.

### 7.   Order To Produce Voir Dire Transcript Is Moot

Jackson requested in an August 15, 2012 Motion to this Court that Respondent produce "the voir dire transcript" from his trial, representing the transcript was " 'essential' for petitioner to 'develop[] fully' his claim of ineffective assistance of counsel, in that trial counsel failed to request

removal of juror #5 . . . . " (ECF No. 8.)  By Order entered September 18, 2012, the undersigned Magistrate Judge granted his motion.  (Order, ECF No. 9.)  Respondent was instructed to include the transcript in its lodgments accompanying the Answer "and to serve Petitioner with a copy of that voir dire transcript."  (Id.)  The Lodgments filed October 1, 2012 along with Respondent's Answer  contain the notation in Volume 1 of the Reporter's Transcript:  "(Voir dire reported, not herein transcribed)." (Lodgment No. 16, RT vol. 1, pp. 7, 10.)  In an October 15, 2012 filing docketed as a "Notice", Jackson informed the Court he had "yet to receive a copy of the voir dire transcript" and asked for the Court's assistance to secure a copy.  (ECF No. 18.)  Jackson again requested a copy of the voir dire transcript on October 19, 2012, pursuant to the Court's September order.  (ECF No. 18.)  He filed his Traverse on November 28, 2012.  (ECF No. 19.)

The only voir dire record material to Jackson's challenge to the retention of Juror No. 5 is the separate proceeding during trial to explore her potential bias, discussed above in connection with Jackson's IAC claim on this issue.  Respondent provided the transcript of that proceeding in the lodged record.  (See Lodgment No. 16, RT vol. 3, pp. 296-308; see also RT vol. 3, pp. 462-464.) Accordingly, this Court's order that Respondent provide Jackson with a reporter's transcript of all voir dire proceedings is discharged as moot, and no further document production obligation remains.

### F.    Ground Five:  Cumulative Error

Jackson argues as Ground Five:   "The accumulation of errors in this case violated Mr. Jackson's right to due process." (Pet. 43, ECF No. 1.)  The Ninth Circuit recognizes that the combined effect of discrete trial errors, even when none of them individually warrants relief, can be found in some circumstances to have had a substantial and injurious effect on the jury's verdict.

> The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. Chambers [v. Mississippi], 410 U.S. 284,] 298, 302-03 [1973] (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"). The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal. Chambers, 410 U.S. at 290 n. 3.

Parle v. Runnels, 505 F.3d 922, 927 (9th  Cir. 2007) (footnotes and parallel citations omitted); see also, e.g., Phillips v. Woodford, 267 F.3d 966, 985-86 (9th Cir. 2001) ("We consider the cumulative

prejudicial effect of multiple trial errors in determining whether relief is warranted"), *citing* Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir.1992) (per curiam) (holding "significant errors occurred, that considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death");  Alcala v. Woodford, 334 F.3d 862, 882-83 (9th Cir. 2003) (holding that "the combined prejudice of the multiple errors committed in this case deprived [petitioner] of a fundamentally fair trial and constitutes a separate and independent basis for granting his petition").

Jackson's cumulative prejudice claim necessarily presupposes that the Court would find that substantial error occurred in connection with at least two of his claims.  *See* Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible"), *citing* United States v. Larson, 460 F.3d 1200, 1217 (9th Cir.2006) (rejecting cumulative error claim where the court discovered no error in the defendants' trial).  Jackson has not established that any substantial constitutional error occurred in his case, foreclosing relief on this theory.

For all the foregoing reasons, it is recommended the Court find that the state courts' rejection of all Jackson's federal claims comports with controlling United States Supreme Court authority and is objectively reasonable.  As he is not in custody in violation of federal law, the Court should **DENY** the Petition in its entirety.  28 U.S.C. § 2254(a).

## III.    CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Dana M. Sabraw under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  For all the foregoing reasons, **IT IS RECOMMENDED** this habeas Petition be **DENIED** on the grounds that Petitioner is not in custody in violation of any federal right.  **IT IS FURTHER RECOMMENDED** the Court issue an Order (1) approving and adopting this Report and Recommendation and (2) directing that judgment be entered denying the Petition.

**IT IS HEREBY ORDERED** that no later than **February 11, 2013**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

/ / /

1   **IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with the Court

2   and served on all parties no later than **February 21, 2013**.  The parties are advised that failure to file

3   objections within the specified time may waive the right to raise those objections on appeal of the

4   Court's Order.  *See* Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d

5   1153, 1157 (9th Cir. 1991).

6   DATED:  January 18, 2013

7

8                                           Hon. Nita L. Stormes
                                            U.S. Magistrate Judge
9                                           United States District Court